## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**SHERIKA FRANKLIN,**

   **Plaintiff,**

v.                                                  **Case No: 6:21-cv-383-PGB-DCI**

**JASON POPOVICH,**

   **Defendant.**

_____/

### ORDER

This cause comes before the Court on the Defendant Jason Popovich's Motion for Summary Judgment (Doc. 22 (the "**Motion**")), Plaintiff Sherika Franklin's response in opposition (Doc. 31), and Defendant's corresponding reply (Doc. 33). Upon consideration, the Motion is due to be granted.

## I.    BACKGROUND[1]

This dispute stems from the 2017 fatal shooting of Christopher Redding, Jr. (the "**Decedent**") by Defendant, an Orange County Sheriff Deputy. Defendant is

---

[1]   The following facts are not reasonably in dispute based on the record evidence unless indicated otherwise. In instances where there is a genuine dispute of material fact, the Court will indicate each parties' contrary position. The parties failed to file a jointly signed stipulation of agreed material facts along with the summary judgment briefing as required by the Court's Case Management Scheduling Order. (Doc. 16, p. 8). The Court normally relies on this document to focus the Court's analysis on disputed rather than undisputed facts. However, this omission is the fault of both parties since both are required to make this filing; the Court nevertheless finds itself capable of sifting through the admissible record. (*Id.* ("On or before the date on which the memorandum in opposition is due, the parties **SHALL** also file a stipulation of agreed material facts signed by the movant and the parties opposing summary judgment. Material facts set forth in the stipulation will be deemed admitted for the purposes of the motion." (emphasis in original)). Accordingly, the Court will still consider the Motion.

a member of a specialized unit within the Orange County Sheriff's Office trained to surveil and apprehend felony suspects known or regarded to be especially violent or dangerous named the Investigative Support Squad (the "**ISS Unit**"). (Doc. 22-7, ¶¶ 3–4). The ISS Unit wanted Defendant, a 20-year-old male, in connection with a series of strong-arm robberies and burglaries. (Doc. 22-3, 21:2–10; Doc. 22-7, ¶¶ 4–8).[2]  The ISS Unit arrested Redding on January 26, 2017 and transported him to the Orange County Jail after the investigating detectives developed probable cause to charge Redding with these crimes. (Doc. 22-2, 8:4–9:10; Doc. 22-3, 7:17–8:8; Doc. 22-7, ¶¶ 4–8). While Decedent was ineligible for bond, he was released in error a few days later. (Doc. 22-12). A new warrant was issued for Decedent, this time based on parole violations flowing from the strong-arm robbery and burglary charges. (*Id.*). Decedent had previously been conditionally released from prison on supervised probation for prior felony convictions of at least aggravated battery with a firearm. (Doc. 22-2, 8:10-9:4; Doc. 22-3, 21:2–10, 7:17–8:8; Doc. 22-12). The new warrant was marked "Violent Offender of Special Concern." (Doc. 22-12; Doc. 22-13).

On February 28, 2017, the ISS Unit received information that Decedent was at the Park Central Apartments. (Doc. 22-2, 7:19–8:5; Doc. 22-7, ¶¶ 7–11).

---

[2] Plaintiff argues that information received by the ISS Unit from unidentified officers or witnesses is inadmissible hearsay. (Doc. 31, pp. 2–4). While made by unidentified out of court declarants, the statements are not offered to prove their substantive truth but instead to provide contextual background for the officer's state of mind on the day in question. As such, these and other similar statements challenged by Plaintiff are admissible. *U.S. v. Price*, 792 F.2d 994, 996 (11th Cir. 1986) (non-hearsay informant's statements offered to put law enforcement statements into context).

Accordingly, the ISS Unit, comprised of Sergeant Rick Stelter ("**Sergeant Stelter**"), Deputy Chris Marcus ("**Deputy Marcus**"), Deputy John Leone ("**Deputy Leone**"), Deputy Javier Alvaro ("**Deputy Alvaro**") and Defendant, was dispatched to the Park Central Apartments to locate and apprehend Decedent. (Doc. 22-1, 26:1–11; Doc 22-3, 12:1–15). Each member of the ISS Unit received word over the radio that Decedent was armed with a .40 caliber pistol and had resolved not to go back to jail. (Doc. 22-2, 7:19–8:5, 12:14–13:2; Doc. 22-4, 10:25–11:6; Doc. 22-5, 12:7–11; Doc. 22-7, ¶¶ 9–11). At some point, the ISS Unit split up, and Defendant searched for Decedent away from Sergeant Stelter, Deputy Leone, Deputy Alvaro, and Deputy Marcus who together began to surveil a grey Ford Focus believed to be connected with Decedent. (Doc. 22-1, 28:16–25; Doc. 22-2, 11:17–12:2, 17:8–18:17).

Decedent emerged and walked toward the Ford Focus with an adult female and two infant children.[3] (Doc. 22-2, 18:19–19:11; Doc. 22-5, 14:15–14:22). At some point when the party was near or in the car, Sergeant Stelter gave the

---

[3]  Plaintiff cites to a Florida Department of Law Enforcement ("**FDLE**") report, which took statements from several witnesses who were not deposed in this case, including the adult female referenced here. (Doc. 31-3). The Court agrees with Defendant that the witness statement summaries in the FDLE report, which are not based on the author's own contemporaneous observations, are inadmissible hearsay unless some exception allows them in. *See Doe v. City of Miami Gardens*, 389 F.Supp.3d 1118, 1123–24 (S.D. Fla. 2019) (citing *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) (concluding at summary judgment stage that FDLE report containing summaries of conversations with and sworn statements by non-parties is inadmissible hearsay within hearsay)). Plaintiff fails to point out any exception that would make these statements admissible. Even so, the Court reviewed the FDLE report and notes that its contents, if admissible, would not change the Court's ultimate conclusions.

command to "takedown" Decedent. (Doc. 22-2, 19:14–20:10; Doc 22-5, 14:25–15:9).

Deputies Leone and Alvaro activated their emergency lights, closed in on the Ford Focus, stepped out of their vehicle with a pistol and a shotgun respectively, and demanded Decedent show his hands.  (Doc. 22-2, 19:5–11; Doc. 22-4, 40:1–21; Doc. 22-5, 52:1–52:17). At some point, Sergeant Stelter also got out of a vehicle and gave the same command. (Doc. 22-2, 20:23–22:13). Decedent did not emerge from the car or put both of his hands in the air despite commands from the officers to do so, although he did raise his left hand; Sergeant Stelter yelled at some point, "Show me your right hand." (*Id.*). It is not clear from the record who fired first, but twelve to fifteen seconds later, a bullet struck Sergeant Stelter. (*Id.* 23:1–25:25). Deputies Marcus, Alvaro, and Leone returned fire, but nothing in the record indicates that Sergeant Stelter was struck by friendly fire. (Doc. 22-3, 14:1–18:12; Doc. 22-4, 15:10–19:13; Doc. 22-5, 26:9–27:6). While Deputy Marcus stayed behind to aid Sergeant Stelter, (Doc. 22-3, 14:15–15:12), Deputies Alvaro and Leone pursued Decedent east through or near a parking lot and then north through or near another parking lot; the deputies testified they ran in and out of cars for cover while they pursued Decedent who they still believed either was actively shooting at them or was capable of doing so. (Doc. 22-4, 18:13–22:20; Doc. 22-5, 28:1–30:17, 32:20–33:12, 70:5–17; Doc. 22-10).

It is not disputed that Decedent fired at least three bullets from inside the car and at least two more after exiting the vehicle. (Doc. 31, p. 9). At some point,

Decedent dropped his weapon—either voluntarily or due to a gunshot wound; regardless, Decedent continued to flee. (Doc. 22-5, 28:1–30:17, 66:15–67:5). Despite Plaintiff's unsupported allegations to the contrary, all the pursuing deputies on the scene testified they did not see Decedent drop the weapon or realize he no longer carried it. (Doc. 22-1, 30:1–2; Doc. 22-3, 19:16–20:2; Doc. 22-4, 19:23–20:2; Doc. 31, p. 9). Deputy Leone testified that the deputies' sight of Decedent was intermittent as the officers ducked in and out from behind cover as they pursued him. (Doc. 22-4, 22:23–23:2).   The officers later recovered Decedent's firearm in the parking lot between where the shooting began and where Decedent stopped running. (Doc. 22-5, 66:15–67:5).

Defendant drove towards the scene to assist after Sergeant Stelter alerted the ISS Unit on the radio that he had spotted the Decedent. (Doc. 22-1, 28:16–28:25). As Defendant approached the area near the Ford Focus, the shooting began, so when he saw Decedent fire at the officers, Defendant stopped and took cover behind his car. (*Id.* 29:10–20, 44:12–22). While moving for cover, Defendant lost his radio but not before he heard, "Signal 43, Officer Down." (*Id.* 45:1–23). After Decedent fled the Ford Focus, Defendant joined Deputies Alvaro and Leone in pursuit. (Doc. 22-1, 136:23–137:8). At one point in pursuit, Defendant testified he saw Decedent "pop[] up violently with his hands together, like with a gun and start[] to aim at us" after which he took cover and heard several rounds being fired. (*Id.* 137:5–8). When Defendant next looked for Decedent from behind cover, Decedent was already on the ground. (*Id.* 137:5–19). Defendant believed Decedent

had the gun underneath him because he did not see it lying anywhere near the area where Decedent had fallen. (*Id.* 57:4–24; Doc. 22-4, 65:7–66:1). Two minutes passed from the moment when Decedent was reported down and when the fatal shots were reported. (Doc. 31-3, p. 3).

Defendant and Deputy Leone approached Decedent who was bloody from at least eight gunshot wounds. (*Id.* 67:17–69:12). They did not immediately cuff him because they did not have personal protective that would allow them to safely and securely restrain him while doing so. (*Id.*; Doc. 22-4, 24:11–19). Either Deputy Leone or Defendant yelled: "Stop moving," "Remain still," "Help is on the way," and "Keep your hands away from you." (Doc. 22-4, 54:3–6, 55:9–13). In the meantime, Deputy Leone and Defendant stood on Decedent's arms or hands with their guns drawn to secure him. (Doc. 22-1, 81:13–24, 130:1–131:8, 133:3–133:18, 135:14–136:1; Doc. 22-4, 25:12–15; Doc. 22-6, 9:5–10:6, 7:16–7:18, 14:3–8; Doc. 22-9, 6:20–7:9, 13:10–15).

Deputies Kevin Lynch and Cynthia Homestead arrived around the same time to assist on the scene, and either Defendant or Deputy Leone asked Homestead to get gloves in order to secure the Decedent. (Doc. 22-6, 27:2–27:11; Doc. 22-9, 8:1–8:8). Deputy Homestead did not witness the fatal event because she was scanning the scene and/or attempting to retrieve personal protective equipment when it occurred. (Doc. 22-9, 8:16–9:1, 21:12–23, 22:6–23:14).

At some point after the arrival of Deputies Lynch and Homestead, Decedent yelled "I'm dying," and made at least a sudden convulsive movement and pulled at

least one of his hands inward towards his body in a way that caused Deputy Leone to spin away from Decedent. (Doc. 22-1, 104:18–25; Doc. 22-4, 32:9–17; Doc. 22-6, 9:21–10:6). In response, Defendant fire two fatal shots at Decedent's head. (Doc. 22-1, 79:19–22, 104:20–25; Doc. 31-4). Defendant testified he believed Decedent to be reaching for his gun to once again fight back. (Doc. 22-1, 79:19–22, 104:20–25).

In 2021, Plaintiff Sherika Franklin—the personal representative of the estate of the Deceased—filed a single-count complaint against Defendant under 42 U.S.C § 1983, alleging Defendant's use of deadly force violated Plaintiff's Fourth Amendment right to be free from excessive force. (Doc. 1, ¶¶ 27–33). Defendant now moves for summary judgment on the basis of qualified immunity and the factual record before the Court. (Doc. 22). After Plaintiff's response (Doc. 31) and Defendant's reply (Doc. 33), this matter is ripe for review.

## II.   STANDARD OF REVIEW

To prevail on a summary judgment motion, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case. An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).

"[B]ecause the court may only consider evidence that would be admissible at trial, the court may not consider inadmissible hearsay when deciding a motion for summary judgment, and the court may strike [] inadmissible portions of the [record] and consider the rest." *Pashoian v. GTE Directories*, 208 F. Supp. 2d 1293, 1297 (M.D. Fla. 2002); *see also Taffe v. Wengert*, 775 F. App'x 459, 465 (11th Cir. 2019)[4] ("We may consider a hearsay statement in passing on a motion for summary judgment [only] if the statement could be reduced to admissible evidence at trial or reduced to admissible form.") (quotations omitted) (citing *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

> Such a motion, whether or not accompanied by affidavits [or other admissible record evidence], will be made and supported as provided in this rule, and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.

*Id.* (internal quotations omitted).

Ultimately, the Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party and resolve all

---

4   "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

reasonable doubts about the facts in favor of the non-movant." *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015) (quoting *Carter v. City of Melbourne*, 731 F.3d 1161, 1166 (11th Cir. 2013) (per curiam)). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  DISCUSSION

Defendant argues that qualified immunity protects him from Plaintiff's excessive force claim based on the admissible factual record. Plaintiff responds with three main arguments: (1) Plaintiff does not bear the burden to show qualified immunity is inapplicable; (2) Plaintiff maintains a genuine dispute of fact exists regarding whether Defendant applied objectively unreasonable excessive force to Decedent in violation of the Fourth Amendment; and (3) Plaintiff attempts to show Decedent's Fourth Amendment rights were clearly established at the time of the events in question. However, the Court finds these contentions unavailing for the following reasons.

## A.   The Burden of Proof for Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Jacoby v. Baldwin County*, 835 F.3d 1338, 1343–44 (11th Cir. 2016). If the government officials were acting within the scope of their discretionary authority, then the plaintiff has the burden to show that qualified immunity is inappropriate by affirmatively putting forward evidence that establishes the government officials violated their rights and by showing that those rights were clearly established at the time of the misconduct. *Jacoby*, 835 F.3d at 1344.

Here, the Court finds there is no genuine dispute that Defendant was acting within his discretionary authority, and so Plaintiff bears the burden to show Defendant is not entitled to qualified immunity. To determine whether an employee was acting within their discretionary authority for the purposes of qualified immunity, courts in the Eleventh Circuit "ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Plaintiff argues the *Holloman* test is inapplicable because the facts there involved a First Amendment claim, not a Fourth Amendment claim as here. (Doc. 31, p. 13). However, this attempt to distinguish *Holloman* fails because both this case and the *Holloman* case involve a government official attempting to claim qualified

immunity—the specific basis for the federal cause of action is immaterial. *See id.*

Defendant was clearly pursuing a job-related goal based on the facts in the record—

that is, arresting Decedent in lieu of his outstanding warrant and securing the area

after a firefight in which another officer had been shot. Plaintiff nevertheless

argues that Defendant was not acting within his discretionary capacity because:

> its [sic] clear that Popovich's discretion [sic] duties would not
> allow him to shoot Redding in the back of the head twice
> which amounts to an execution while Redding was unarmed
> and had been lying on the ground being tortured for at least
> two minutes as a result of Deputy Popovich and Deputy Leone
> standing on each of Redding's arms instead of securing him
> and providing him with medical attention.

*Id.* The first problem with this argument is that it is conclusory and unsupported

by citation to the record. Even so, the *Holloman* court explained why Plaintiff's

line of reasoning puts the cart before the horse:

> One might reasonably believe that violating someone's
> constitutional rights is never a legitimate job-related function
> or within the scope of a government official's authority or
> power. As we explained in *Harbert Int'l, Inc. v. James*, 157
> F.3d 1271, 1282 (11th Cir. 1998), however, "the inquiry is not
> whether it was within the defendant's authority to commit the
> allegedly illegal act. Framed that way, the inquiry is no more
> than an untenable tautology." In applying each prong of this
> test, we look to the general nature of the defendant's action,
> temporarily putting aside the fact that it may have been
> committed for an unconstitutional purpose, in an
> unconstitutional manner, to an unconstitutional extent, or
> under constitutionally inappropriate circumstances.
>
> Consider the first prong of the test—whether the official is
> engaged in a legitimate job-related function. In *Sims v.
> Metropolitan Dade County*, 972 F.2d 1230 (11th Cir. 1992),
> "we did not ask whether it was within the defendant's
> authority to suspend an employee for an improper reason;
> instead, we asked whether [the defendant's] discretionary
> duties included the administration of discipline." *Harbert*,
> 157 F.3d at 1282. Similarly, in assessing whether a police

> officer may assert qualified immunity against a Fourth
> Amendment claim, we do not ask whether he has the right to
> engage in unconstitutional searches and seizures, but whether
> engaging in searches and seizures in general is a part of his
> job-related powers and responsibilities. *See, e.g.*, *Madiwale v.*
> *Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997). Put another way,
> to pass the first step of the discretionary function test for
> qualified immunity, the defendant must have been
> performing a function that, *but for* the alleged constitutional
> infirmity, would have fallen with his legitimate job
> description.

370 F.3d at 1266. Here, but for the alleged constitutional infirmity, Defendant possessed the general authority to apprehend Decedent, a wanted felon, and to secure the area after a firefight as a lawfully commissioned deputy of the ISS Unit; there is no genuine dispute that these duties fall within Defendant's legitimate job description. (Doc. 22-2, 8:10–9:4; Doc. 31, p. 9); *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 n.16 (11th Cir. 2019) ("The pursuit and apprehension of suspected criminals is a core discretionary function of the police."). As such, Plaintiff bears the burden to affirmatively defeat Defendant's assertion of qualified immunity with admissible record evidence.

## B.   Qualified Immunity

 Qualified immunity shields government officials from suits for damages unless a plaintiff demonstrates (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the alleged conduct such that the defendant had fair notice that their conduct was actionable. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021). Courts "have discretion to decide which of the two

prongs of the qualified[] immunity analysis to tackle first," and the government officials are "entitled to qualified immunity if the plaintiff fails to establish either one." *Ashcroft*, 563 U.S. at 735; *Jacoby*, 835 F.3d at 1344. The Court here will first address whether Plaintiff has affirmatively produced record evidence that Defendant violated Decedent's Fourth Amendment right to be free from excessive force before turning to whether Decedent's rights were clearly established at the time of the events in question.

       *1.*    *Fourth Amendment Excessive Force Claim*

The Fourth Amendment protects against objectively unreasonable searches and seizures by the government. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "Apprehension by deadly force constitutes a seizure." *Wilson v. Parker*, 746 F. App'x 860, 863 (11th Cir. 2018). "Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is necessary in the situation at hand." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quotation omitted). "No precise or 'rigid preconditions' exist for determining when an officer's use of deadly force is excessive." *Beckman v. Hamilton*, 732 F. App'x 737, 740 (11th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372 (2007)). Rather, when deciding the merits of an excessive force claim on a motion for summary judgment, courts must determine on a case-by-case basis whether the force used was objectively reasonable under the totality of the circumstances based on the admissible record. *See Graham*, 490 U.S. at 396; *see also Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007) ("Because the test of

reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, we must slosh our way through the fact bound morass of reasonableness.") (quotations, alterations, and citations omitted). However, "[i]n cases involving [allegations] of excessive force, it is doctrinal gospel that [courts] do not view an officer's actions with the 20/20 vision of hindsight." *Shaw v. City of Selma*, 884 F.3d 1093, 1101 (11th Cir. 2018); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) ("Our task is not to evaluate what the officers could or should have done in hindsight. The sole inquiry is whether the officer's actions, as taken, were objectively reasonable under all the circumstances."). As such, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Accordingly, "[courts] are loath to second-guess the decisions made by police officers in the field." *Beckman*, 732 F. App'x at 741 (quotations and citations omitted). Of course, courts do not credit an officer's version of events just because a plaintiff or decedent cannot personally rebut it. *Brown v. Nocco*, 788 F. App'x 669, 674 (11th Cir. 2019) (citing *Hinson v. Bias*, 927 F.3d 1103, 1118 (11th Cir. 2019)). Instead, "[w]here circumstantial or other evidence, if believed, would tend to discredit the police officer's story, or where such evidence could convince a rational factfinder that the officer acted unreasonably, we do not simply accept the officer's account." *Id.* (citations and quotations omitted).

In this case, the Court rejects as baseless Plaintiff's contentions that Defendant willfully executed Decedent in retaliation for shooting Officer Stelter during the initial firefight between the officers and Decedent. Plaintiff failed to produce one iota of record evidence in support of this claim beyond mere speculative allegation. Moreover, Defendant's testimony—that he mistakenly believed Decedent to still be armed and interpreted Decedent's movement of at least one of his arms to be an attempt to reach for this weapon—is consistent with the rest of the admissible record evidence, Plaintiff's unsupported allegations notwithstanding. (Doc. 22-1, 79:19–22, 104:20–25). Consequently, this is not an instance where the Court is simply crediting the Defendant's testimony as a police officer because the Decedent is not present to rebut it. *Brown*, 788 F. App'x at 674. While the Court appreciates the difficulty of producing affirmative evidence in cases such as these where the decedent is no longer present to share their side of the story, Plaintiff still must bring forward at least some affirmative record evidence to demonstrate the presence of a genuine dispute regarding material facts because Plaintiff bears the burden to show qualified immunity is inappropriate. Plaintiff fails to make this showing with respect to his allegation the Defendant willfully executed Decedent despite knowledge of his harmlessness.

However, the Court's inquiry does not end there. Even if there is no genuine dispute regarding Plaintiff's most remarkable assertions, the factual question remains whether, based on circumstantial evidence, Defendant's deadly use of

force in response to his mistaken belief that Decedent was about to fight back with a deadly weapon was objectively reasonable.

To aid in this inquiry, the Supreme Court and the Eleventh Circuit have provided factors to guide courts in their determination of whether an officer's use of deadly force was objectively reasonable: (1) the severity of the crime or crimes at issue; (2) whether an officer has probable cause to believe either that the suspect poses a threat of serious physical harm to those at the scene or that the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm; (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight; (4) whether the suspect poses an immediate threat to the safety of the officers or others; (5) whether the officer reasonably believes the use of deadly force was necessary to prevent escape or prevent the suspect from inflicting further serious physical harm; or (6) whether the officers gave some warning about the possible use of deadly force, if feasible. *Graham*, 490 U.S. at 396; *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985); *Spencer v. City of Orlando*, 725 F. App'x 928, 931 (11th Cir. 2018); *Perez v. Suszczynski*, 809 F.3d 1213, 1222 (11th Cir. 2016). Notably, "[a] mechanical application of these factors is not appropriate" because they are not "prerequisites to the lawful application of deadly force by an officer seizing a suspect" but instead only some contextual considerations that may apply differently in each circumstance. *See Scott*, 550 U.S. at 382–83; *see also Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010) (citations and quotations omitted).

Even after applying these factors, genuine disputes of material fact continue to persist regarding the reasonableness of Defendant's use of force. First, the underlying crimes leading up to Defendant's use of force were extremely severe. Even before the shootout on February 28, 2017, Decedent was a wanted violent felon for strong arm robberies and violent felonies. (Doc. 22-3, 21:2–10; Doc. 22-7, ¶¶ 4–8; Doc. 22-11; Doc. 22-12). After Decedent engaged the police in a firefight and shot Officer Stelter, Decedent's underlying crimes were even more grievous.

Second, as a result, Defendant had probable cause to believe both that Decedent posed a threat of serious physical harm to those at the scene and that the suspect had committed a crime involving the infliction of serious physical harm.

Third, it is undisputed that Decedent was at least actively resisting Defendant and Officer Leone's directives to not move his arms while they arrested him. While the extent of Decedent's movements is at least partially in dispute, it is indisputable that Decedent was not wholly compliant and docile.

Fourth, Decedent certainly posed a threat to the officers and the public when he engaged in a shootout, but he no longer possessed his gun at the time when he was shot. While nothing in the record shows that Defendant was aware that Decedent was no longer armed, the mere fact that Decedent was unarmed creates a credibility issue which the Court cannot weigh in on at this procedural posture. In addition, it is an undisputed fact that Decedent's back was facing Defendant when Defendant fired (even if, as Defendant asserts, Decedent was beginning to move his torso upwards and his hands inwards), which is circumstantial evidence

that speaks to the reasonableness of Defendant's perception of a threat and his response to it. At the same time, the Court pauses to note that the number of shots fired and where they hit Decedent's body is immaterial to the question of reasonability; instead, the inquiry here is whether it was objectively reasonable for Defendant to fire his weapon at Decedent *at all*. *Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("If an officer reasonably but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force than in fact was needed."); *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) ("*[I]f police officers are justified in firing at a suspect in order to end severe threat to public safety*, the officers need not stop shooting until the threat has ended." (emphasis added)). Furthermore, the Court finds it relevant that Decedent had already been shot at least eight times and was obviously bleeding to the point that the officers required personal protective equipment to safeguard against blood-borne diseases in order to fully apprehend Decedent. Be that as it may, Decedent was still able to move at least somewhat forcefully.

Fifth, whether Defendant reasonably believed the use of deadly force was necessary to prevent Decedent from inflicting further serious physical harm hinges on whether it was reasonable for Defendant to believe Decedent armed and/or to interpret his movements as threatening. Certainly, "[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect," *Long*, 508 F.3d at 581, but here

Decedent no longer actually possessed a deadly weapon and was bleeding from multiple previous gunshot wounds while lying downward on the ground.

Sixth, it is not disputed in the record that while Decedent was on the ground, Defendant and/or Officer Leone yelled: "stop moving," "remain still," "help is on the way," and "keep your hands away from you." While none of these commands provide express warning of lethal force, the fact that they were given in short succession after a firefight tends to indicate they provided effectively similar notice.

Thus, in sum total, genuine factual disputes still exist such that a reasonable jury could find either way on the question of the reasonableness of Defendant's use of force, but Plaintiff still must demonstrate that Decedent's rights were clearly established at the time of the conduct in question. *Ashcroft*, 563 U.S. at 735.

### 2. *Clearly Established Right*

In the Eleventh Circuit, a right can be clearly established in one of three ways. *Crocker*, 995 F.3d at 1240. Plaintiffs must point to either (1) "case law with indistinguishable facts," (2) "a broad statement of principle within the Constitution, statute, or case law," or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Id.* (quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)). "Although options two and three may suffice," the Supreme Court has warned not to "define clearly established law at a high level of generality." *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal quotation marks

omitted)). Moreover, while it is true that in these second and third options there is no requirement that prior "materially similar" precedential cases exist, *Hope v. Pelzer*, 536 U.S. 730, 746 (2002), these "obvious clarity" cases require that the statute or provision at issue be so clearly violated and the conduct so egregious that case law is unnecessary for every objectively reasonable government official to know it would violate federal law. *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017). "For that reason, the second and third paths are rarely-trod ones." *Id.* (collecting cases). Thus, when a plaintiff relies on a general rule to argue that the law is clearly established, that law must clearly and obviously apply to the circumstances at hand. *Crocker*, 995 F.3d at 1240 (citing *Long*, 508 F.3d at 584); *see also Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) ("[I]f a plaintiff relies on a general rule, it must be obvious that the general rule applies to the specific situation in question."). At summary judgment, the legal question of whether a defendant is entitled to qualified immunity must be determined under the version of facts that is most favorable to plaintiff where the record demonstrates a genuine factual dispute persists. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002).

Here, Plaintiff argues that they need not present the Court with "materially similar" precedent to show qualified immunity is inappropriate. (Doc. 31, p. 12 (citing *Hope*, 536 U.S. at 739–41)). While generally true, this would require Plaintiff to demonstrate that this case falls into either option two or three by putting forward affirmative record evidence that Defendant obviously and clearly

violated Decedent's rights. Plaintiff's allegation that Defendant violated Decedent's Fourth Amendment "right to be free from excessive use of force" fails on this count because it describes Decedent's rights at too high a level of generality. (*Id.* at p. 13). Moreover, Plaintiff unsuccessfully attempts to remedy this by further alleging:

> Defendant sh[ot] [Decedent] in the back of the head twice which amounts to an execution while [Decedent] was unarmed and had been lying on the ground being tortured for at least two minutes as a result of [Defendant] and Deputy Leone standing on each of Redding's arms instead of securing him and providing him with medical attention.

(*Id.*). But, as already discussed, Plaintiff failed to produce admissible record evidence in support of these incendiary allegations, so a finding in Plaintiff's favor would instead require an inference that it was objectively unreasonable for Defendant to shoot Decedent because of his mistaken belief that the indisputably partially non-compliant Decedent was about to fight back using a deadly weapon. While the Court finds a reasonable jury *could* make that inference based on circumstantial evidence, Plaintiff still bears the burden to show that such law was clearly established on February 28, 2017 by pointing to "case law with indistinguishable facts." *Crocker*, 995 F.3d at 1240 (citing *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018)).

Put another way, Plaintiff is incorrect that he need not here satisfy the requirements of option one by pointing to a case from "decisions of the United States Supreme Court, [the Eleventh Circuit], or the highest court in a state" to demonstrate the law was clearly established in February 2017. *Id.*; *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997) (noting in the

Eleventh Circuit, statutory or constitutional rights are "clearly established" "only by decisions of the [United States] Supreme Court, [the] Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose."). This high precedential bar ensures that an officer has "fair notice that [their] conduct was unlawful," *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004), as the contours of the constitutional right at issue will have been "sufficiently clear that a reasonable official would understand that what [they were] doing violates that right." *Hope*, 536 U.S. at 739 (quotation marks omitted).

The only case that Plaintiff affirmatively proffers to show the law in this area was clearly established, *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016), is not on point. In *Perez*, whether a local police officer was entitled to qualified immunity after shooting a decedent from behind was also at issue. *Id.* at 1216. In contrast, though, the Eleventh Circuit affirmed the district court's denial of summary judgment because the estate affirmatively produced evidence that the defendant-officer was compliant and non-resistant. *Id.* The Eleventh Circuit dismissed some of the *Perez* defendant's arguments as they were:

> effectively challenges to the Estate's version of events and the credibility of the Estate's witnesses. Accordingly, it is worth noting that, if the Estate's version of the facts was "inherently incredible and could not support reasonable inferences sufficient to create an issue of fact," *Riley v. City of Montgomery*, 104 F.3d 1247, 1251 (11th Cir. 1997), we would reject it. As the Supreme Court has instructed, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott[]*, 550 U.S. [at] 380 [] (finding appellate

court erred in affirming denial of qualified immunity in an interlocutory appeal because the plaintiff's version of events was not supported by the record).

[In the *Perez* case], however, there is no evidence clearly contradicting the Estate's version of the facts. [The *Perez* defendant] offers no evidence that "so utterly discredit[s] [the Estate's witnesses'] testimony that no reasonable jury could believe [the witnesses]." *See Morton*, 707 F.3d [1276,] 1284 [(11th Cir. 2013)]. Instead, "[t]he record plainly yields sharply dueling accounts of what happened and why the critical shots were fired"; it does not "utterly discredit" the Estate's account. *See id.* at 1285. Thus, we are required to credit the Estate's account at this stage in the proceedings, accepting the evidence of the Estate and drawing all justifiable inferences in its favor. And, in the Estate's version of events, [the *Perez* defendant] shot a compliant, prostrate man in the back "while having no reason to believe that the man would place anyone's safety in danger." *See id.* at 1282. No reasonable officer would have used deadly force under these circumstances. Therefore, [the *Perez* defendant's] use of force against [the *Perez* decedent]—shooting [the *Perez* decedent] while he was prostrate and compliant on the ground—violated [the *Perez* decedent's] Fourth Amendment right to be free from excessive force.

*Perez*, 809 F.3d at 1220–21.

Here, however, Plaintiff (as representative of Decedent's estate) has put forward an incredible version of the events which is contradicted by the record evidence. Similar to *Perez*, Plaintiff alleges Decedent was lying prostrate and unresistant on the ground in an unthreatening way when he was shot, but unlike in *Perez*, Plaintiff has not pointed to witnesses that specifically rebut Defendant's and other on-the-scene officer's claims that the previously armed Decedent who had the moment before engaged in a shootout with the officers was at least partially non-compliant and moving in a way the officers believed to indicate an attempt to fight back. *Id.* Thus, the Court is not required to credit Plaintiff's speculative

version of events based on conjecture alone. *Scott*, 550 U.S. at 380. More importantly, these factual differences mean the *Perez* case is materially dissimilar from this one.

With Plaintiff offering no other potentially indistinguishable case law, Plaintiff has not carried their burden to show that the law was clearly established at the time of this incident. Therefore, Defendant is entitled to qualified immunity, and the Court must grant the Motion on this basis.

## IV.   CONCLUSION

For the aforementioned reasons, it is **ORDERED** and **ADJUDGED** as follows:

1.      The Motion (Doc. 22) is **GRANTED**;

2.      The Complaint (Doc. 1) is **DISMISSED WITH PREJUDICE**;

3.      The Clerk of Court is **DIRECTED** to close the case.

**DONE AND ORDERED** in Orlando, Florida on September 26, 2022.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

24